# CASES

## DECIDED IN THE

# SUPREME COURT OF GEORGIA

### AT THE

## MARCH TERM, 1898.

---

### HUNNICUTT *et al. v.* CITY OF ATLANTA *et al.*

1. While a city charter which confers authority "to purchase, hold, receive, enjoy, possess and retain, for the use and benefit of the said city, in perpetuity, or for any term of years, any estate or estates—real or personal—lands, tenements, hereditaments, of what kind or nature soever, within the limits or without the limits of said city, for corporate purposes," invests the mayor and council with very broad powers as to the acquisition of property for the benefit of the municipality, and might warrant a purchase by them of an undivided interest in realty, if made under a contract securing to the city a legitimate use of such interest "for corporate purposes," they are not, by virtue of the foregoing language in the charter, empowered to purchase for the city any realty, or any interest therein, merely as an investment.

2. A contract by a city, alleged to have been made by virtue of such a provision in its charter, for the purchase of an undivided one-fifth of a lot with a building thereon, is void unless it distinctly and unequivocally secures to the city the right to occupy and use for municipal purposes, so long as it shall own any interest in the fee, a portion, at least, of the property.

3. If the building in question be a county court-house in actual use as such, and one which is incapable of being used at the same time for both county and municipal purposes, and the contract, without absolutely securing for the city a right of occupancy, in effect merely provides that if, after a specified date, the city shall obtain exclusive possession, it shall pay a stipulated rent to the county for its interest in the property, but that if such possession be not delivered to the city, it shall receive from the county a specified rent for the city's interest, such purchase should be regarded and treated as one of investment only.

4. The above-indicated restrictions upon the powers of the mayor and council of a city with reference to the purchase of realty for its use and benefit are not removed by the grant of special legislative authority "to create a sinking-fund from the taxes and other incomes of said city, to provide a fund for the purchase, or acquiring of a site by condemnation proceedings, for a city-hall building, and for the erection of a city-hall building." Of course, the power "to purchase a site and building, or a site only, for a city hall, and to pay for the same in five or more annual instalments," could not be constitutionally exercised without first obtaining in the manner prescribed by law the assent of two thirds of the qualified voters of the city.

5. The rules above laid down are none the less applicable in a given instance because the contract in question further provides that, after acquiring an undivided one-fifth in the property, the city may, if it so elects, in each of the four years next ensuing, acquire additional one-fifths until it shall have become the owner of the entire fee, it however not being bound to purchase any one or more of such additional interests, but the other contracting party agreeing to convey the same if taken and paid for.

6. If the provision in section 348 of the Political Code, authorizing the proper county officials, by order entered upon their minutes, to "direct a disposal of any real property which can lawfully be disposed of," can, when a court-house becomes inadequate to the county's uses, be invoked as authorizing a sale of the same, together with the land upon which it is situated, as "public property" which has "become unserviceable," it does not warrant the sale of an undivided one-fifth of a court-house and lot, in actual daily use for county purposes, under a contract by the terms of which the remaining four-fifths may never be sold, and which provides that while the same remain unsold the county may, for a greater or less time, continue to keep and use the whole of the property, paying rent for the interest therein, with the title to which it had undertaken to part.

Argued February 25, — Decided April 1, 1898.

Petition for injunction. Before Judge Lumpkin. Fulton county. January 31, 1898.

*Palmer & Read*, for plaintiffs. *J. A. Anderson, J. T. Pendleton, L. Z. Rosser* and *A. C. King*, for defendants.

LUMPKIN, P. J. In September, 1897, the mayor and general council of Atlanta, without first obtaining the consent of two thirds of the qualified voters of the city agreeably to law, entered into a contract with the commissioners of roads and revenues of Fulton county for the purchase of certain real estate on which is situated the court-house of that county. In pursuance of this contract, the mayor executed, in the name of the city, five promissory notes, payable to the county commission-

ers, the first of which was to become due on the first day of November, 1897, and the others, respectively, on the first day of July in each of the four years next ensuing. The commissioners executed and delivered to the mayor a bond for title, in the name of the county, conditioned to convey the above-mentioned property to the city upon the payment of these notes. Collier, a resident of Fulton county, and Hunnicutt, a resident of Atlanta, who were taxpayers of both the county and city, filed an equitable petition to enjoin the county and municipal authorities from carrying into effect the contract above mentioned. A restraining order was granted; but before any hearing was had, the defendants, evidently becoming satisfied that this contract was violative of par. 1, sec. 7, art. 7 of the constitution (Civil Code, § 5893), which, with certain exceptions, forbids any municipal corporation from incurring any new debt without the assent of two thirds of the qualified voters thereof, entered into another arrangement which will hereinafter, in the language employed in the arguments here, be referred to as the "second trade." It was, in effect, as follows:

The mayor and general council of the city adopted the resolutions below copied. The preamble to the same recited the terms of the original contract between the city and the county, and declared that "it is the desire of the mayor and general council of the City of Atlanta to conform in all respects to the law, constitutional and statutory, regulating their conduct in office;" that "it is believed to be best for the government and people of the city and of the county of Fulton that the proposed purchase shall be made;" and that the action then about to be taken was "to the end . . that this may be done in such manner as to obviate all legal objections." These resolutions were in the following words: "Resolved, by the mayor and general council of the City of Atlanta, that the mayor of said city be, and he is hereby, authorized to contract with the commissioners of roads and revenues of Fulton county with reference to the purchase of said court-house property, according to the metes and bounds defined in the bond for titles now held by the City of Atlanta, on the following terms: The City of Atlanta to pay the commissioners of roads and revenues of

Fulton county $30,000 in cash, upon the payment of which the commissioners of roads and revenues, aforesaid, will execute to the City of Atlanta good and sufficient titles to an undivided one-fifth interest in said property, and will also execute an undertaking binding upon said county that the City of Atlanta may acquire, at its option, other undivided one-fifth interests in said property whenever, during the years 1898, 1899, 1900 and 1901, said city shall pay other sums of $30,000 for such undivided one-fifth interests, the county commissioners to deliver possession to the City of Atlanta of the entire premises above described on January 1st, 1899. On a basis of the valuation of $150,000 for the whole, the city shall pay to the said county rent for such proportionate interest in the building as is owned, from time to time, by the county, on the basis of four per cent. on such valuation from the time the city goes into possession. In the event the said county should fail to deliver possession on said 1st day of January, 1899, then, for such time thereafter as it shall occupy said entire premises, it shall pay a like rental to the city upon its proportionate interest in said building, on the basis of the above valuation of $150,000 for the whole. Be it further resolved, in the event of the acceptance of this offer by the commissioners aforesaid, the contract heretofore executed shall be abrogated by mutual consent; and the notes and bond for titles heretofore executed shall be returned to the several makers thereof and cancelled."

The board of county commissioners (with the exception of one of its members, H. E. W. Palmer) expressed to the mayor and council a willingness to enter into a contract in accordance with the terms of the resolutions above set forth. Thereafter the plaintiffs amended their petition, alleging what had been done with a view to the making of this "second trade," and praying that the defendants be enjoined from consummating the same. At the hearing, the trial judge enjoined the county and city authorities from carrying into effect the first contract, but denied the injunction prayed for in the plaintiffs' amendment. In other amendments to the plaintiffs' petition, and in the original and amended answers of the defendants, various facts were stated and numerous questions raised with which it

will not, in the view we take of the case, be necessary for us to deal. The facts already set forth, and those which will be stated as we proceed, are all that are material to an understanding of our adjudications with reference to this controversy.

1. The "second trade" has very much the appearance of being an attempt to accomplish indirectly that which was undertaken in the original contract. Thus treating it, there would be strong reason for holding that the transaction was unlawful, because violative of the above-cited paragraph of the constitution. But dealing with it upon its merits, and without any reference whatever to what had previously occurred, we are still of the opinion that the injunction prayed for ought to have been granted. The act of 1874, establishing a new charter for the City of Atlanta, confers upon its mayor and council the broad powers expressed in the language quoted in the first headnote. Acts of 1874, p. 116. It will be noted, however, that the authority given to purchase property for the use and benefit of the city is limited by the requirement that the same must be purchased, held, etc., *for corporate purposes only.* It was certainly never contemplated that the city should embark in speculative ventures, or make any contracts in the nature of mere investments. In this connection, see 2 Dillon on Municipal Corporations (4th ed.), §§ 561–563. In the last of these sections it is declared that even "general authority to purchase and hold property should, doubtless, be construed to mean for purposes authorized by the charter, and not for speculation or profit." And to the same effect, see Tiedeman on Municipal Corporations, § 200, and the numerous cases cited in support of the text. It may therefore be assumed as absolutely free from doubt that under the charter of the City of Atlanta, and upon general principles, its mayor and council have no authority to purchase in the city's behalf any property except such as may be legitimately used in effectuating the objects for which the corporation was created; and it would seem to follow that, in making a contract for the acquisition of property, the mayor and council should take care to see that it secures to the city a right to use and enjoy the property for the purposes indicated.

2. It may be that a city, in order to secure suitable quarters

for the transaction of the municipal business, might be authorized to purchase an undivided fifth, or other fractional interest, in a lot with a building thereon, if the contract of purchase distinctly and unequivocally secured to the city the right to occupy, so long as it held an interest in the fee, a portion of the property appropriate to the desired uses.   But we are quite confident that a purchase of such an interest in realty under a contract which gave to the city no right of occupancy at all would be void.  This is so because a contract of this nature would in its essence be simply one of investment, and therefore, as we have seen, forbidden.

3. In the present case, the building in which the city seeks to acquire an undivided interest is the court-house of Fulton county, which is in actual daily use as such.   It also appears that this building is incapable of being used at the same time for both county and municipal purposes.   It is, in fact, too small for the accommodation of the various courts and county officers. It was conceded that a partial occupancy of it by the officials of the city is entirely out of the question.   Indeed, such a thing has never been contemplated by any of the persons concerned in this litigation.   An examination of the resolutions adopted by the mayor and council as the basis of the "second trade" will show, we think, that a contract drawn in accordance with these resolutions would fall far short of giving to the city an absolute and unequivocal right to occupy the whole or any portion of the premises.   It is true that one clause in effect provides that if the city shall make the first payment of $30,-000 in cash, and a like payment during the year 1898, the commissioners are "to deliver possession to the City of Atlanta of the entire premises above described on January 1st, 1899." But it will be seen that the resolutions do not contemplate that the city shall, in any event, have possession until it shall have acquired title to two fifths of the property ; and yet it was urged here that the action of the present mayor and council could in no sense bind or constrain any future council, for the reason that the city was to be left entirely free to take, or not to take, a second undivided fifth, and accordingly would be at perfect liberty not to do so unless it saw proper.   If, therefore, the city

had already paid down $30,000 in cash and had obtained a deed to an undivided one-fifth interest in the court-house property, and the council in power in 1898 should decline to make another payment, there is no way under these resolutions for the city to ever get the use of the court-house, or any portion of the same. That such a contingency might arise was evidently in contemplation when the resolutions were adopted ; for they also provide : "In the event the said county should fail to deliver possession on said 1st day of January, 1899, then, for such time thereafter as it shall occupy said entire premises," it must pay a specified rental to the city. It would, accordingly, be within the power of the county, for an indefinite period, to keep the city from occupying the court-house ; and if the county authorities chose to exercise this power, the city would have nothing but a naked investment of $30,000 upon which it would be entitled to receive four per cent. per annum. Even if it could be assured of the collection thereof, its holding could properly be regarded as nothing more nor less than an investment of corporate funds at four per cent. We entertain no doubt of the correctness of the proposition, that a municipal corporation can not buy an undivided interest in realty unless the terms of the contract of purchase assure to the city, absolutely and beyond peradventure, the right to use the property it thus acquires for legitimate municipal purposes, without regard to the will of any person or corporation whatsoever. If this is good law, "the second trade" can not be lawfully carried into effect.

4. Counsel for the defendants in error also relied upon the special provisions of the act of December 23, 1896, amending the charter of the city. The 5th section of this act authorizes "the mayor and general council of said city, in their discretion, to create a sinking-fund from the taxes and other incomes of said city, to provide a fund for the purchase, or acquiring of a site by condemnation proceedings, for a city-hall building, and for the erection of a city-hall building. The amount to be paid into such fund each year shall be such as may be prescribed by the mayor and general council by ordinance, and to also authorize the mayor and general council of Atlanta, in

their discretion, to purchase a site and building, or a site only, for a city hall, and to pay for the same in five or more annual instalments." Acts of 1896, p. 113. We do not think the language just quoted adds anything to the comprehensive powers which the mayor and council already enjoyed under the act of 1874; and besides, the facts show that the mayor and council are not endeavoring, by condemnation proceedings or otherwise, to acquire a site for a city-hall building, or to make provision for the erection of such a building. Manifestly, the other provision contained in the section above quoted, which empowers "the mayor and general council of Atlanta, in their discretion, to purchase a site and building, or a site only, for a city hall, and to pay for the same in five or more annual instalments," could not, without a submission of the question of purchase to the qualified voters of the city, be constitutionally carried into effect; for this would involve the creation of a new debt which could not be incurred without their assent.

5. The intended contract between the city and the county is not cured of the fatal defects therein already pointed out because the resolutions in question contemplate that the city, after acquiring an undivided one-fifth in the property, may, if it so elects, in each of the years 1898, 1899, 1900 and 1901, acquire an additional one-fifth, until it shall have become the owner of the entire fee; for while the county is willing to enter into an agreement to convey these additional interests to the city, if it desires to take and pay for the same, the city would not, under the terms of the resolutions, be bound to continue to purchase separate fifths until it became the sole owner. We therefore come back to the original standpoint. Under the terms of such a contract, the city might become the owner of one-fifth, two-fifths, three-fifths, or even four-fifths, and yet at last have nothing but an investment of money bearing interest at four per cent., in the event the county, instead of relinquishing possession of the property, chose still to occupy the premises and pay therefor the rent to which the city under the terms of the resolutions would be entitled.

6. We have, thus far, dealt with the case as if the right of the county to dispose of its court-house property in the manner

indicated was free from doubt. We do not, however, by any means concede that any such right exists. On the contrary, we are quite confident that it does not. Section 278 of the Political Code provides that "When any public property shall become unserviceable, it may be sold or otherwise disposed of, by order of the proper authority;" and section 348 declares "The ordinary has the control of all property belonging to the county, and may . . direct the disposal of any real property which can lawfully be disposed of, and appoint a commission to make the titles thereto." If, when a courthouse becomes inadequate to the county's needs, it may be disposed of in accordance with the provisions contained in the sections just cited, the property should be sold as a whole and not by piecemeal. Were it otherwise, the case at bar would present the singular anomaly of a sale by the county authorities of an undivided one-fifth of a court-house and lot to a party in no manner bound to ever purchase any additional interest therein, and yet the county authorities would retain, for a period longer or shorter according to circumstances, the use of this unserviceable (?) property and pay to the purchaser of the one-fifth interest a rental for the same. If the court-house of Fulton county has in fact become unfit for the uses for which it was designed, it should, of course, either be enlarged or disposed of; but we do not think a sale thereof can be made in the manner proposed. It may be that a purchase by the city would be a proper and desirable transaction in its behalf, and that the county, by using the proceeds of such sale, together with other funds lawfully raised for this purpose, might proceed to erect a new court-house adequate to the present and future needs of the county; and consequently, a transaction of the nature originally contemplated between these two corporations might be decidedly beneficial to both. Be this as it may (and as to this matter we express no opinion), such a result can not be accomplished without first submitting to the qualified voters of Atlanta the question whether or not the necessary debt for this purpose shall be incurred by the city.

*Judgment reversed. All the Justices concurring, except Cobb, J., absent.*